UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Rachel Evans,<br><br>   Plaintiff,<br><br>v.<br><br>Rosebud Lending LZO d/b/a ZocaLoans<br><br><br>   Defendant. | No. 22-cv-2126<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

  1. This action concerns an illegal payday loan Defendant Rosebud Lending LZO d/b/a ZocaLoans ("Defendant") made to Plaintiff Rachel Evans ("Plaintiff") pursuant to a loan agreement dated September 1, 2020 ("Loan Agreement") (Exhibit A).

  2. Plaintiff files this Complaint after first attempting to demand arbitration through the American Arbitration Association ("AAA") as required by the Loan Agreement.

  3. On May 2, 2022, Plaintiff had filed her Demand for Arbitration – Consumer, with the AAA, and served a copy on Defendant, in compliance with the Loan Agreement's arbitration clause.

  4. On May 17, 2022, Plaintiff was informed by the AAA that Defendant was not in compliance with AAA's policies regarding consumer claims, and thus AAA had to decline to administer the arbitration. (Exhibit B.)

5. Plaintiff is thus filing her Complaint in this forum and intends to move to compel arbitration after service of this Complaint and the Summons is complete on Defendant.

## PARTIES

6. Plaintiff Rachel Evans is a natural person and resident of Minnesota.

7. Defendant Rosebud Lending LZO d/b/a ZocaLoans puts itself forth as the "tribal lending agency of Rosebud Lending, a subsidiary of the Rosebud Economic Development Corporation, an economic development arm and entity of the Rosebud Sioux Tribe," *see* www.zocaloans.com (last visited Aug. 23, 2022). Defendant is a "consumer short term lender" as defined by Minnesota law because it is "an individual or entity engaged in the business of making or arranging consumer short-term loans" and is not "a state or federally chartered bank, savings, bank, or credit union." Minn. Stat. § 47.601, subd. 1(e).

## JURISDICTION AND VENUE

8. This Court has original jurisdiction over Plaintiff's Racketeer Influenced and Corrupt Organizations ("RICO") claim under 18 U.S.C. § 1962, and 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. The Court also has jurisdiction to enforce the parties' arbitration agreement under 9 U.S.C. § 4.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), (3) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District and Defendant is subject to the Court's personal jurisdiction with respect to the claims alleged

herein. Venue is also proper in this Court pursuant to 18 U.S.C. § 1965(a) because Defendant transacted with Plaintiff in this District.

## GENERAL ALLEGATIONS

10. Defendant, an entity of the Rosebud Sioux Tribe, was formed in conjunction with non-tribal businesses and individuals for the purpose of making illegal payday loans to desperate consumers throughout the United States while shielding the non-tribal entities who take home the vast majority of the profits under the tribe's sovereign immunity.

11. The loans made by Defendant carry usurious interest rates and exorbitant finance charges that are illegal under most states' laws. The $500 loan Defendant made to Plaintiff imposed an annual interest rate of 693.09% and a finance charge of $1071.46. That is more than 21-times the interest rate and 42-times the charge allowed under Minnesota law. Further, the Loan Agreement contains other terms that violate virtually every substantive provision of Minnesota's payday loan laws. The Loan Agreement is therefore *per se* illegal and void *ab initio*. *See* Minn. Stat § 47.601, subd. 6(b)(1).

12. While the Loan Agreement purports to be governed by tribal law, Minnesota has a vital interest in protecting its residents from abusive lending practices such as those employed by Defendant. Plaintiff therefore demands, pursuant to Minnesota law, the return of "all money collected or received in connection with the loan," actual damages, statutory damages of up to $1,000 per violation of Minnesota's payday loan laws, punitive damages, costs and attorneys' fees, and injunctive relief.

**Minnesota's Extensive Regulation of Payday Lending**

13. Payday loans are highly regulated in Minnesota (and most other states). The Minnesota Legislature substantially amended Minnesota's payday loan laws in 2009 to clarify that the laws applied to payday loan transactions consummated online, to provide for a private cause of action, and to add substantial statutory penalties and fee-shifting provisions. *See* Minn. Stat. §§ 47.60 *and* 47.601 ("Payday Loan Laws"). These statutes refer to payday loans as "consumer small loans" and "consumer short-term loans." Minn. Stat. § 47.60, subd. 1(a); Minn. Stat. § 47.601, subd. 1(d).

14. The amended statutes place strict caps on the amount of interest and fees that such lenders can charge. *Id.* As relevant here, for loans above $350 and less than $1000, Minnesota law caps the annual interest rate at 33%, and caps administrative fees at $25. Additionally, consumer short-term lenders must be licensed by the Minnesota Department of Commerce before lending or arranging loans to Minnesotans. Minn. Stat. § 47.601, subd. 2(a)(3)(i). Minnesota law further prohibits loan contracts from containing provisions "selecting a law other than Minnesota under which the contract is construed or enforced," "choosing a forum for dispute resolution other than the state of Minnesota," or "limiting class actions against a consumer short-term lender." Minn. Stat. § 47.601 subd. 2(a)(1)-(3).

15. Minn. Stat. § 47.601, subd. 2(c) also requires consumer short-term lenders to make certain disclosures. Specifically:

> A consumer short-term loan lender must furnish a copy of the written loan contract to each borrower. The contract and disclosures must be written in the language in which the loan was negotiated with the borrower and must contain:

> 1. the name; address, which may not be a post office box; and telephone number of the lender making the consumer short-term loan;
> 2. the name and title of the individual employee or representative who signs the contract on behalf of the lender;
> 3. an itemization of the fees and interest charges to be paid by the borrower;
> 4. in bold, 24-point type, the annual percentage rate as computed under United States Code, chapter 15, section 1606; and
> 5. a description of the borrower's payment obligations under the loan.

16. A consumer short term lender who violates the statute is liable to the borrower for "all money collected or received in connection with the loan," actual damages, "statutory damages of up to $1,000 per violation," costs and attorneys' fees, and injunctive relief. *Id.* § 47.601, subd. 6.

17. The State of Minnesota has devoted considerable resources trying to combat payday lenders who charge usurious interest rates and otherwise violate Minn. Stat. §§ 47.60 and 47.601.[1] The Minnesota Attorney General's Office also engaged in public

---

[1] *State of Minnesota v. Jelly Roll Financial, LLC*, No. 19HA-CV-10-1703 (Dakota County, Mar. 31, 2010); *State of Minnesota v. Eastside Lenders, LLC*, No. 19HA-CV-10-1705 (Dakota County, Mar. 31, 2010); *State of Minnesota v. Global Payday Loan, LLC*, No. 27-CV-10-6381 (Hennepin County, Mar. 31, 2010); *State of Minnesota v. Silverleaf Management d/b/a Upfront Cash*, No.330-cv-11-305 (Kanabec County, Sept. 6, 2011); *State of Minnesota v. Flobridge Group LLC*, No. 62-CV-11-7171 (Ramsey County, September 6, 2011); *State of Minnesota v. Sure Advance LLC*, No. 27-CV-11-18350 (Hennepin County, Sept. 6, 2011); *State of Minnesota v. Integrity Advance*, No. 62-CV-11-7168 (Ramsey County, Sept. 6, 2011); *State of Minnesota v. CashCall Inc.*, No. 27-CV-13-12740 (Hennepin County, July 11, 2013).

education efforts regarding the dangers of online payday loans and issued a publication warning the public about such lenders.[2]

18. As a payday lender offering loans to Minnesotans, Defendant is aware or should be aware of Minnesota's strict Payday Loan Laws and the extensive regulatory action taken by Minnesota regulators. Defendant, however, pays no heed to Minnesota's licensure requirements and subjecting Minnesotans to loans with usurious interest rates and exorbitant fees. Defendant's loans routinely contain other terms and provisions that make the loans invalid under Minnesota law, including illegal purported class action waivers and illegal choice of law provisions. Defendant also fails to make the disclosures required by Minn. Stat. § 47.601, subd. 2(c) in connection with its loans.

## **Rosebud Lending Is Part Of An Enterprise Designed to Make Illegal Loans To Consumers Such As Plaintiff**

19. Defendant is part of a scheme to make online short-term loans that carry triple-digit interest rates, often exceeding 800%, that are illegal in many states, including Minnesota. High interest loans often target vulnerable borrowers and, if left unregulated, can economically devastate borrowers and their communities. Consumers often take out new loans when they are unable to pay their original loans off, creating a cycle of mounting debt.

---

[2] *See, e.g.*, https://www.ag.state.mn.us/Brochures/pubPaydayLoans.pdf.

20. Over the years, online lenders have concocted various schemes to make high-interest loans over the internet in an attempt to avoid state usury laws, including the "off-shore" scheme and the "tribal" or "sovereign" lending scheme.

21. In the so-called "off-shore model," the lender is purportedly located off-shore, such as in Belize, but in reality, the lender operates in the United States. The purpose of the off-shore model is to attempt to evade usury laws and discourage regulators by purportedly operating outside the United States. In 2013, the Department of Justice initiated "Operation Chokepoint" which investigated banks that did business with companies that the DOJ believed to be at high-risk for fraud and money laundering. As a result of Operation Chokepoint, the off-shore model of lending significantly declined as lenders could not find banks or payment processors willing to do business with a purportedly off-shore online lending business. Since Operation Chokepoint, online lenders have transitioned to tribal lending schemes.

22. In a tribal lending scheme, the lender affiliates with a Native American tribe to create the appearance of tribal ownership and insulate the scheme from federal and state law by piggy-backing on the tribe's sovereign legal status and the tribe's general immunity from suit under federal and state laws. The purpose of the scheme is so that the non-tribal schemers "can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012)). Tribal lending schemes are not designed to promote

tribal business but instead are contrivances aimed at avoiding state usury laws, with the vast majority of the revenues going to non-tribal entities, and tribes receiving one or two percent of the revenue.

23.     In or around 2012, Defendant was formed by the Rosebud Economic Development Corporation ("REDCO"), the economic development arm of the Rosebud Sioux Tribe, a federally recognized Native American tribe, in conjunction with non-tribal entities, such 777 Partners and F3EA Holdings.[3] The non-tribal entities provided the capital used to make the high-interest loans.[4] Upon information and belief, the vast majority of the profits made under the name ZocaLoans do not go to the Rosebud Sioux or REDCO but instead go to non-tribal entities.[5]

24.     Upon information and belief, Defendant is organized under the laws of the Rosebud Sioux Tribe for the dual purposes of avoiding state usury laws and shielding non-

---

[3] *See*, *e.g.*, *In re: Princeton Alternative Income Fund, LP*, No. 18-14603, ECF No. 751, ¶¶ 9, 12, 30, 31, 33 (Bankr. D.N.J. July 29, 2019); www.777part.com/team_member/Jennifer-menard/ (last visited April 5, 2022) ("she was employed by F3EA Holdings in April 2016, with the ZocaLoans portfolio").

[4] Defendant has made and collected on illegal loans across the country under several different names, including ZocaLoans, Advance Me Today, 1800899Cash, First Pay Loans, My Quick Wallet, Pixy Cash, QCredit, Big Star Credit, Arrow Financial, and Arrow Credit.

[5] *See*, *e.g.*, REDCO Annual Report for 2019 (showing Rosebud Lending with $51 million in assets, but REDCO only receiving $3 million in revenues, and "management fee" of over $30 million paid out, likely to the non-tribal entities); REDCO Annual Report for 2018 (stating Rosebud Lending had operating revenue of only $1.8 million, and showing a $936,933 "Management Fee" paid out, likely to the non-tribal entities); *see also e.g.*, 2021.06.15 public Facebook Post by Lynne Colombe ("We haven't seen any revenue from REDCO since 2019 (less than $300k)" "I'm tired of learning more about our 'Tribal business' from Google").

tribal participants in the enterprise from liability.[6] Defendant provides a front to the non-tribal individuals and businesses, who wish to make and collect on illegal loans across the country. Though Defendant has very little involvement in the day-to-day management and operations of the lending business, Defendant knowingly agreed to the collection of unlawful debt and its facilitation of the illegal lending enterprise is a key component of the scheme.

25. Non-tribal entities provide the capital and exerts significant control over the lending business. These non-tribal entities' control over Defendant includes a security interest in the bank account used to make loans under Defendant's subsidiary "Rosebud Lending RQC."[7] Further, upon information and belief, the non-tribal entities designate the states in which Defendant is permitted to lend in and the interest rates it is permitted to charge.

26. Defendant has also entered into agreements with 777 Partners, LLC, a Miami private investment firm to make and collect on usurious loans under the name ZocaLoans. Upon information and belief, Josh Wander, a founding and managing partner of 777 Partners, helped develop the illegal lending business, including negotiating the agreement between Defendant and 777 Partners and registering the domain name for ZocaLoans.[8]

---

[6] REDCO lists "Arrow Financial Services" as one of its "Enterprises" and describes it as an "empowered FinTech company." https://www.sicangucorp.com/arrow-financial-services (last visited April 6, 2022). In 2020, REDCO "move[d] all of Rosebud Lending operations to Arrow Financial Services." REDCO 2019 Annual Report at 10.

[7] *In re: Princeton Alt. Income Fund, LP*, No. 18-14603, ECF No. 751 ¶ 53.

[8] *See, e.g., Hussam Al-Nahhas v. Rosebud Lending LZO, et al.*, No. 1:22-cv-00750, ECF No. 1-2 at 44 (N.D. Ill. Feb. 10, 2022).

27. 777 Partners has ties to other payday lending schemes as well, indicating a business practice pattern of using tribes to provide the veil of sovereign immunity to the usurious lending.[9]

28. The non-tribal entities also provide the majority of the operational support off of tribal lands, such as operating call centers.[10] Very little, if any, of the operations of Defendant take place on the reservation, and REDCO only has around 60 employees total, across its "enterprises."[11]

---

[9] *See*, *e.g.*, www.777part.com/team_member/ed-gehres/ (last visited April 5, 2022) ("Mr. Gehres also recently served as outside General Counsel to Think Finance); www.777part.com/team_member/matthew-ghourdjian/ (last visited April 5, 2022) ("Mr. Ghourdjian served as [ ] the CIO of DiTech.com and CashCall."); www.777part.com/team_member/hussien-sleiman/ (last visited April 5, 2022) ("Mr. Sleiman was the lead technical architect and manager on the development of the CashCall and LoanMe cloud native lending and servicing platforms"); www.777part.com/team_member/anand-bhonge/ (similar); www.777part.com/team_member/pheap-thang (similar); www.777part.com/team_member/carter-chee (similar).

[10] *See*, *e.g.*, *In re Princeton Alt. Income Fund, LP*, No. 18-14603, ECF No. 751 ¶ 32; www.777part.com/team_member/Jennifer-menard/ (last visited April 5, 2022) ("she was employed by F3EA Holdings in April 2016, with the ZocaLoans portfolio as payment processor, moving up to call center trainer and head of quality assurance"); www.postjobfree.com/resume/adp04f/financial-services-loan-mckeesport-pa (last visited April 5, 2022) ("F3EA Loan Servicing, LLC/Zoca Loans – Pompano Beach, FL September 2016 to April 2017" "• Established loan production that exceeded company goals in the training class of a startup unsecured loan company. Reviewed loan documentation and critically analyzed each application for completeness, accuracy and compliance.• Analyzed short term installment loan applications per credit policy and lending regulations. Managed the online lending process from loan origination through loan funding. Guided consumers through the loan application process.• Developed partnerships with loan underwriters and loan operations teammates to facilitate unsecured loan funding, while minimizing risk."); https://www.linkedin.com/in/vanessa-ponce-6aa761135/ (last visited April 5, 2022) ("Customer Service Supervisor at Zoca Loans – Miami-Fort Lauderdale Area").

[11] "The [Rosebud] reservation [unemployment] rate is over six times higher than the state unemployment rate." https://sdhda.org/images/docu/housing-development/Housing-Needs-Studies/Final-REDCO-Housing-Study-HQ-PDF-no-bleed.pdf (last visited April 5,

**Plaintiff's Illegal Payday Loan From Defendant**

29. On September 1, 2020, Plaintiff applied for a payday loan on https://www.zocaloans.com using her personal computer in Mound, Minnesota. Plaintiff provided her Minnesota address to Defendant when she applied for the loan. Defendant approved Plaintiff's application and the Parties entered the Loan Agreement for $500.

30. The Loan Agreement violates Minnesota's Payday Loan Laws in at least six different ways, including:

(1) Defendant is not licensed to make short-term consumer loans or consumer small loans in Minnesota;

(2) It imposed an annual interest rate of 693.09%, more than **21 times greater** than the 33% allowed under Minnesota law;

(3) It imposed a finance charge of $1071.46;

(4) It contains a clause choosing the laws of the Rosebud Sioux Tribe as the applicable law;

(5) It contains a clause purporting to waive the right to participate in a class action;

---

2022); *see also* https://www.lakotatimes.com/articles/redco-presents-388k-to-rst/ (Nov. 21, 2019) ("'REDCO has grown from 1 employee to 57 employees in 7 years,' stated Wizipan Little Elk, REDCO CEO."); https://www.sicangucorp.com/post/redco-announces-new-venture-and-job-openings (Aug. 18, 2017) (Rosebud Lending "announce[s] the opening of Antelope Lake Communications (ALC), a call center specializing in handling customer service calls in the financial service industry. REDCO is now seeking qualified applicants to fill 12 [] positions.").

(6) It does not contain the required disclosures, such as a name of the Defendant employee signing the agreement, the address of the lender (not a PO box), and the annual percentage rate as computed under United States Code, chapter 15, section 1606 in bold, 24-point type, font.

31. Plaintiff made seven payments of $130.95 toward the loan, paying a total of $916.65 before she stopped making payments on the illegal loan. CLAIMS FOR RELIEF

## COUNT ONE
**Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c)-(d)**

32. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

33. Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

34. The Enterprise, as that term is defined in 18 U.S.C. § 1961(4), consists of Defendant and non-tribal participants.

35. Defendant participated in the Enterprise for the common purpose of profiting off of the collection of unlawful debt by offering and collecting on loans to consumers through the online lender Defendant, which purports to offer loan agreements governed solely by tribal law.

36. The Enterprise has an ongoing organization with an ascertainable structure, and it functions as a continuing unit with separate roles and responsibilities. This conduct began sometime in the last ten years and continues to date.

37. Defendant violated 18 U.S.C. § 1962(c) by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt by, among other things, providing the name of the Rosebud Tribe through REDCO to be used as the nominal entity behind the lending to provide a false shield of sovereign immunity to the unlawful loans.

38. RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6). The loan made to Plaintiff included an interest rate far in excess of twice the enforceable rate in Minnesota. Plaintiff was injured as a direct result of Defendant's violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

39. Defendant also violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Defendant, through its principals, knowingly and willfully agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect on unlawful debt at more than twice the lawful rate of interest under state usury laws. Plaintiff was injured as a direct result of Defendant's violations of 18 U.S.C. § 1962(d) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

40. Defendant is jointly and severally liable to Plaintiff for the injuries caused by the Enterprise. Plaintiff seeks recovery of her actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT TWO
## Violations of Minn. Stat. § 47.601

41. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

42. Defendant is a consumer short-term lender as defined Minn. Stat. § 47.601, subd. 1(d). Defendant committed at least six violations of Minn. Stat. § 47.601 when it entered the Loan Agreement with Plaintiff.

43. Defendant is not licensed in Minnesota but made an illegal loan to Plaintiff. Defendant's loans charged Plaintiff interest and fees in excess of that allowed by Minn. Stat. § 47.601, subd. 2.

44. The Loan Agreement contains terms that are prohibited by Minn. Stat. § 47.601, subd. 2.

45. Defendant failed to make the disclosures required by Minn. Stat. § 47.601, subd. 2(c) to Plaintiff.

46. Plaintiff has been harmed by Defendant's illegal business practices.

47. Plaintiff seeks a declaration that the Loan Agreement is void and unenforceable, a return of all money collected or received in connection with the loan; actual, incidental, and consequential damages; statutory damages of $1,000 for each of the alleged six violations; costs, disbursements, and reasonable attorney fees; and injunctive relief requiring Defendant to comply with Minnesota law.

## COUNT THREE
## Violation of Minn. Stat. § 325d.44
## (Uniform Deceptive Trade Practices Act)

48. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

49. The conduct described herein constitutes "deceptive trade practices" within the meaning of Minnesota law because it has caused the likelihood of confusion or of misunderstanding as to the source, sponsorship, approval and certification of Defendant's loans.

50. The conduct described herein constitutes "deceptive trade practices" within the meaning of Minnesota law because it has caused the likelihood of confusion or of misunderstanding as to the affiliation, connection, or association with, or certification of Defendant's loans.

51. The conduct described herein constitutes "deceptive trade practices" within the meaning of Minnesota law because it constitutes Defendant representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; or that a person has a sponsorship, approval, status, afflation, or connection that the person does not have.

52. The conduct described herein constitutes "deceptive trade practices" within the meaning of Minnesota law because it constitutes Defendant engaging in conduct which similarly creates likelihood of confusion or of misunderstanding.

53. Plaintiff has been harmed as a result of the above practices.

## COUNT FOUR
## Punitive Damages Under Minn. Stat. § 549.20

54. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

55. Defendant's conduct as described above shows deliberate disregard for the rights or safety of others.

56. Defendant knew that its conduct in making short-term loans and the terms of its loans violated state laws, including the laws of Minnesota, and intentionally disregarded those facts when it entered the Loan Agreement with Plaintiff, a Minnesota resident. Defendant knew that there was a high probability that Plaintiff's rights under Minnesota law would be injured when Plaintiff entered the Loan Agreement.

57. Defendant has made hundreds, if not thousands, of illegal loans to Minnesota residents.

58. Despite this knowledge, Defendant deliberately proceeded to act with indifference, or in conscious or intentional disregard, to the high probability that Plaintiff's rights under Minnesota law would be injured when Plaintiff entered the Loan Agreement.

59. The amount of punitive damages should be commensurate with the disregard Defendant consciously showed for Plaintiff's rights under Minnesota law when it made a $500 loan to Plaintiff at more than 21-times the interest rate allowed by law and imposed a $1071.46 finance charge at more than 42-times the amount allowed by law.

**PRAYER FOR RELIEF**

60. Plaintiff seeks to compel Defendant to arbitration per the contract between the parties. Plaintiff also seeks $916.65, treble damages, at least $6,000 in statutory damages, punitive damages, prejudgment interest, costs, attorneys' fees, and an injunction requiring Defendant to cease violating Minnesota law.

**DEMAND FOR JURY TRIAL**

To the extent that arbitration is not compelled, Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

Date:  August 30, 2022                           /s/John G. Albanese

E. Michelle Drake, Bar No. 0387366
John G. Albanese, Bar No. 0395882
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 594-5999
Facsimile: (612) 584-4470
emdrake@bm.net
jalbanese@bm.net

Sophia Rios*
BERGER MONTAGUE PC
401 B Street, Suite 2000
San Diego, CA 92130
Telephone: (858) 252-6649
Facsimile: (215) 875-4604
srios@bm.net
*pro hac vice forthcoming*

*Attorneys for Plaintiff*